AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Northern District of California

**FILED**

APR 20 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Victor Hugo SANCHEZ ESPINO, Milton Gamez FIERRO, Jamex Eugenio CORONEL, Pamela LUNA, Alejandro PARRA-SOLORIA, and Jaime Barrera OREGEL | ) ) ) ) ) |
| *Defendant(s)* | ) |

Case No.

**4-12-70449 MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ April 18, 2012 _____ in the county of _____ Alameda _____ in the

_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A) | Conspiracy to Distribute and to Possess with Intent to Distribute 5 Kilograms or More of Cocaine -- Maximum Penalties: Maximum term of imprisonment of life; mandatory minimum term of imprisonment of 10 years; mandatory min. 5 years of sup. rel.; $10,000,000 fine; and $100 special assessment. |
| 18 U.S.C. § 924(c)(1)(A) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime Maximum Penalties: Maximum term of imprisonment of life; mandatory minimum term of imprisonment of 5 years; maximum term of supervised release 5 years; $250,000 fine; $100 special assessment |

This criminal complaint is based on these facts:

See attached AFFIDAVIT OF ATF SPECIAL AGENT KENNETH R. COOPER

Approved as to form ____ /s/ _____ AUSA Randy Luskey

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael B. Ramos, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **4/19/12**

_____
*Judge's signature*

City and state: _____ Oakland, California _____

Honorable Kandis Westmore, Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kenneth R. Cooper, Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, hereby declare as follows:

### I.    INTRODUCTION

1.      I am currently employed as a Special Agent with the Bureau of Alcohol, Tobacco and Firearms (ATF) and have been since April 2007.  I am currently assigned to the Violent Gangs Task Force (VGTF) in the Seattle Field Division, Washington.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  During this training, I received instruction relating to the investigation of firearm and drug related violations.  Prior to joining ATF, I was a sworn and certified local police officer in Oregon since March 1999 and a graduate of the Oregon Department of Public Safety Standards.  In my eight years of service as a local police officer, I served as a Street Crimes Detective, a Narcotics Detective, and a Major Crimes Team Detective.  I have investigated violations of controlled substance laws including methamphetamine, cocaine, crack cocaine, heroin, marijuana, MDMA (Ecstasy), and prescription medications.  I have processed large marijuana grows and clandestine labs for evidence and have training and experience in the investigation of illegal manufacturing, possession, and delivery of controlled substances.  I also have training and experience regarding homicide investigations and violent assaults including sexual assault, burglary, and robbery.  During my career as a police officer and as a Special Agent, I have been involved in numerous investigations involving the unlawful purchase and/or unlawful possession of firearms and the illegal use of firearms during crimes of violence and/or drug trafficking.  During my career I have participated in or executed

numerous search and seizure warrants with respect to the manufacture and distribution of controlled substances. I have supplied information to support affidavits and/or sworn to affidavits for search and seizure warrants in these investigations. These search and seizure warrants have authorized the search of locations ranging from the residences and vehicles of drug traffickers and their co-conspirators, to houses and structures used for the manufacture of controlled substances. Items searched for and recovered in these locations have included cocaine, cocaine base, other narcotics, US currency, firearms, telephone and address books, cellular telephones, handwritten drug ledgers/pay-owe sheets, and handwritten notes regarding names and telephone numbers of criminal associates. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I respectfully submit this Affidavit in support of a Criminal Complaint charging Victor Hugo SANCHEZ ESPINO, Milton Gamez FIERRO, Jamex Eugenio CORONEL, Pamela LUNA, Alejandro PARRA-SOLORIA, and Jaime Barrera OREGEL for violations of Title 21, United States Code, Sections 846, 841(a), and 841(b)(1)(A): conspiracy to distribute and to possess with the intent to distribute 5 kilograms or more of cocaine and Title 18, United States Code, Section 924(c)(1)(A): using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a drug trafficking crime.

3.      Because this Affidavit is submitted for the limited purpose of establishing probable cause for the arrests of SANCHEZ ESPINO, FIERRO, CORONEL, LUNA, PARRA-SOLORIA, and OREGEL, I have not included each and every fact known to me about this case. Rather, I

have set forth only the facts that I believe are necessary to support the lawful arrests of the individuals listed in this Affidavit.

4.    Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part only.   Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.

## II.    BACKGROUND

5.    ATF Special Agents utilize an investigative technique that identifies individuals suspected of participating in home invasion robberies.   In order to identify and investigate such individuals, ATF S/A Richard Zayas and ATF S/A Christopher Bayless use an undercover persona whereby they assume the role of a cocaine courier who wishes to steal the cocaine which he is expected to deliver from a location where the cocaine is being stored (i.e., the "stash" house) to another destination where it will continue through the distribution chain.   S/A Zayas and S/A Bayless, at times, use reliable ATF Confidential Informant(s) (CI) to make the initial introduction between S/A Zayas and S/A Bayless and the individual or individuals being investigated.   In their undercover capacity, S/A Zayas and S/A Bayless describe to the targets of the investigation that the "stash" house contains an approximate number of kilograms of cocaine guarded by armed individuals and ask the targets whether they are interested in robbing the house of the cocaine. Additionally, S/A Zayas and S/A Bayless provide the targets with several opportunities to withdraw if they do not want to go forward with the robbery.   If the targets agree to commit the

robbery, S/A Zayas and S/A Bayless inform them that they will need to meet again once they know the location of the "stash" house to finalize the plans for the robbery and to follow them to the "stash" house.

6. On February 14, 2012, S/A Cooper and Officer Teddy Chu, Oakland Police Department (OPD), met with confidential informant 3278. 3278 stated he/she had met a person believed to be identified as Victor Hugo SANCHEZ ESPINO. SANCHEZ told 3278 he was involved in home invasion style robberies of drug stash houses. SANCHEZ stated that he operates with a robbery crew in Northern California, and has a brother who operates with a robbery crew in Phoenix, Arizona. SANCHEZ provided his cellular telephone number, 707-228-3049, to 3278 and informed 3278 to call when 3278 had located a stash house to rob. 3278 has been a reliable confidential informant for the OPD since approximately 1999 and has provided information which led to a federal Title III intercept.

III. **PROBABLE CAUSE**

7. On February 16, 2012, at approximately 10:15 AM, S/A Zayas, in the company of 3278, traveled to an open air mall parking lot located at 5800 Northgate Drive, San Rafael, California. After a few minutes had elapsed, 3278 received a cellular telephone call from SANCHEZ ESPINO. SANCHEZ ESPINO questioned 3278 as to his/her location. 3278 exited S/A Zayas' vehicle in order for SANCHEZ ESPINO to identify his/her location.

8. S/A Zayas observed a silver colored pickup truck arrive in the parking lot and park parallel to his vehicle. S/A Zayas waited approximately one minute and exited the vehicle. SANCHEZ ESPINO introduced himself to S/A Zayas as "HUGO". S/A Zayas advised

–4–

SANCHEZ ESPINO that he was nervous because he and his family would be killed if his associates knew he was speaking with SANCHEZ ESPINO.

9.      S/A Zayas explained that there would be two houses in the Oakland, California area. One house contained one to two million dollars and the second house contained fifty kilograms of cocaine and twenty five pounds of methamphetamine. S/A Zayas further stated that one house would have three armed individuals and the second house would have four armed individuals. S/A Zayas advised that he would either collect five kilograms of cocaine and travel north or collect currency and travel south. S/A Zayas continued to advise that he was due to meet with his associates on Wednesday, February 22, 2012, and would be told the area he was to wait and time he would be called on Friday, February 23, 2012. S/A Zayas stated that the collection always occurred in daylight hours.

10.     S/A Zayas stated that when called on Friday, the day of collection, he would be provided the exact address and allotted a specific amount of time in which to arrive. S/A Zayas advised that the houses would be next to each other and described for SANCHEZ ESPINO the vehicles that would be present, a black colored Lexus, a black colored Cadillac, a grey colored Chrysler 300 and a grey colored Mercedes Benz. S/A Zayas further advised that he would not know until Wednesday if he was due to collect narcotics or currency.

11.     SANCHEZ ESPINO stated that they needed to hit the individuals at the same time. SANCHEZ ESPINO further stated he would have six individuals go to one house and six individuals go to the second house. S/A Zayas questioned SANCHEZ ESPINO if they knew what they were doing. SANCHEZ ESPINO replied "yes, I know, look I have, I have much time working this, that they are armed does not worry us, that is not a problem for us that they are armed or not, that is the only thing, I'm going to bring people from Arizona and people from here, the

thing is we are going to do the job, and it's going to turn out good, those that are armed does not matter to us". SANCHEZ ESPINO agreed to splitting the proceeds of the robbery, kilograms of cocaine, pounds of methamphetamine and currency, in half.

12.     SANCHEZ ESPINO questioned S/A Zayas as to the number of armed individuals in each of the houses. SANCHEZ ESPINO again reiterated that the fact the individuals were armed did not worry them. S/A Zayas stressed the importance of being on time. S/A Zayas requested to meet with SANCHEZ ESPINO on Wednesday, after meeting with his associates. S/A Zayas stated that the collection would definitely occur on Friday.

13.     SANCHEZ ESPINO requested the addresses of the houses. S/A Zayas responded that he would not know the address until the day of collection. S/A Zayas and SANCHEZ ESPINO continued to discuss the fact that S/A Zayas would not have the address until being contacted, at a specific time, on Friday. S/A Zayas questioned SANCHEZ ESPINO "can it be done or not"? SANCHEZ ESPINO stated the job would be done and continued to state the he would need the exact addresses of the houses in order to send an advance team to conduct surveillance of the houses. S/A Zayas questioned SANCHEZ ESPINO if they would execute the robbery on Friday. SANCHEZ ESPINO stated if they did not know where the houses were located, they could not conduct the robbery. S/A Zayas replied that he would not know the addresses in advance.

14.     S/A Zayas observed SANCHEZ ESPINO to be contemplating the information provided by S/A Zayas. SANCHEZ ESPINO stated that he could have his people there and they could follow S/A Zayas to the houses. SANCHEZ ESPINO also stated that S/A Zayas could potentially be blamed for the robbery by his associates. S/A Zayas responded that he wished to be tied and left in the house to avoid suspicion.

15.     SANCHEZ ESPINO stated they would meet again on Wednesday and that he would have people ready for Friday. SANCHEZ ESPINO questioned S/A Zayas about how much narcotics he would be asked to transport.   S/A Zayas replied five to ten kilograms of cocaine or methamphetamine.   SANCHEZ ESPINO further questioned S/A Zayas as to the currency.   S/A Zayas responded that he would transport one million dollars at a time.   SANCHEZ ESPINO advised S/A Zayas he should be sharper and take the currency.   S/A Zayas advised that he did not have the heart to do it.   SANCHEZ ESPINO suggested robbing S/A Zayas of the currency.   S/A Zayas replied that he could do that himself without the assistance of SANCHEZ ESPINO.   S/A Zayas stated that if SANCHEZ ESPINO conducted the robbery it would provide a better appearance.

16.     SANCHEZ ESPINO requested that S/A Zayas provide him the type of vehicles that would be present at the houses in order to not strike the wrong house.   SANCHEZ ESPINO stated he wished to write down the information.   S/A Zayas departed the area in the company of 3278. This conversation was conducted in the Spanish language and was recorded.

17.     On February 15, 2012, at approximately 11:25 AM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049.   3278 advised SANCHEZ ESPINO that his/her associates had arrived and that "all was good".   3278 arranged to meet with SANCHEZ ESPINO the following day in San Rafael, California at 10:00 AM.   SANCHEZ ESPINO agreed to meet. 3278 stated he/she would contact SANCHEZ ESPINO or SANCHEZ ESPINO could contact him/her in the morning to identify a meeting location.   This conversation was conducted in the Spanish language and was recorded.

18.     On February 16, 2012, at approximately 9:43 AM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049.   3278 advised SANCHEZ ESPINO that he/she

would contact him when he/she was in the area. SANCHEZ ESPINO stated he would be at the Best Buy. 3278 further advised that his/her associate was nervous. SANCHEZ ESPINO assured 3278 that everything would turn out fine. 3278 stated that upon arriving, he/she would contact SANCHEZ ESPINO. This conversation was conducted in the Spanish language and was recorded.

19.     On February 16, 2012, at approximately 10:02 AM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049. 3278 advised SANCHEZ ESPINO that he/she had missed the exit and was at a mall parking lot. SANCHEZ ESPINO replied that he did not know the area very well. 3278 provided SANCHEZ ESPINO with directions to his/her location. This conversation was conducted in the Spanish language and was recorded.

20.     On February 22, 2012, at approximately 9:34 AM, S/A Zayas, in the company of 3278, traveled to the Best Buy parking lot located at 700 Du Bois Street, San Rafael, California. After approximately eight minutes had elapsed, S/A Zayas observed a silver colored pickup truck arrive in the parking lot and park perpendicular to his vehicle, in close proximity.

21.     S/A Zayas and 3278 exited S/A Zayas' vehicle and approached SANCHEZ ESPINO. After an initial greeting, S/A Zayas advised SANCHEZ ESPINO that he was due to be called at 3:00 PM, on Friday, and had been told to wait near the Oakland Coliseum. S/A Zayas further advised that he was due to collect "seven kilos of coca" to deliver to the Seattle, Washington area. S/A Zayas stated that the vehicles that would be present at the houses were a black colored Lexus, a black colored Cadillac, a grey colored Mercedes Benz and a grey colored Chrysler.

22.     3278 suggested meeting at a location in Oakland where alleged surplus used vehicles for sale were stored. S/A Zayas advised that 3278 could meet with SANCHEZ ESPINO

–8–

and his associates in San Rafael at 1:00 PM on Friday. S/A Zayas further advised that he would travel to the surplus location and contact 3278, via cellular telephone, to ensure the area was "clean". Once the area had been determined to be "clean", all participants could travel from San Rafael to the surplus location.

23.     S/A Zayas asked SANCHEZ ESPINO if his crew was ready. SANCHEZ ESPINO responded "I have my people". SANCHEZ ESPINO continued to respond that it did not matter that the individuals in the houses were armed. S/A Zayas assured SANCHEZ ESPINO that the narcotics would be present in the house. SANCHEZ ESPINO advised "the kids are going to enter to knock down, they are going to say throw yourself on the floor". SANCHEZ ESPINO stated that S/A Zayas must listen to their commands and that they would be put on the ground and tied up. SANCHEZ ESPINO further stated that S/A Zayas should be calm, that nothing would happen to him and that they would take the things they were there for.

24.     SANCHEZ ESPINO advised that the occupants of the houses could not view 3278. Otherwise they would detect him/her and S/A Zayas' role in the robbery. 3278 suggested that he/she could drive by the houses and indicate the location with his/her brake lights. SANCHEZ ESPINO stated that if they observed 3278 by the houses, they would identify his/her involvement. SANCHEZ ESPINO advised that he had been involved in this type of work for some time. SANCHEZ ESPINO explained that the people who bring him information have certain options to prevent them from being exposed as connected to the robbery. SANCHEZ ESPINO provided an example of an individual who had been exposed in providing him information which led to a robbery.

25.     SANCHEZ ESPINO agreed to meet with 3278 at 1:00 PM, on the day of the robbery, and wait for S/A Zayas to call concerning the meeting location in Oakland. S/A Zayas

–9–

suggested 3278 call SANCHEZ ESPINO the following day to arrange a meeting location in San

Rafael. SANCHEZ ESPINO agreed to this arrangement. SANCHEZ ESPINO continued to

reiterate to 3278 to avoid being near the houses. S/A Zayas and 3278 departed the area. This

conversation was conducted in the Spanish language and was recorded.

     26.    On February 22, 2012, at approximately 8:55 AM, 3278 contacted SANCHEZ

ESPINO via cellular telephone, (707) 228-3049. 3278 arranged to meet with SANCHEZ

ESPINO at the Best Buy parking lot. SANCHEZ ESPINO agreed to meet at this location. This

conversation was conducted in the Spanish language and was recorded.

     27.    On February 23, 2012, at approximately 2:54 PM, 3278 contacted SANCHEZ

ESPINO via cellular telephone, (707) 228-3049. 3278 arranged to meet with SANCHEZ

ESPINO, the following day, at the Best Buy parking lot at 1:00 PM. SANCHEZ ESPINO agreed

to meet at this location and time. 3278 stressed the importance of meeting on time to conduct the

"job". This conversation was conducted in the Spanish language and was recorded.

     28.    On February 24, 2012, at approximately 12:28 PM, 3278 contacted SANCHEZ

ESPINO via cellular telephone, (707) 228-3049. SANCHEZ ESPINO stated that he had a

problem. SANCHEZ ESPINO further stated that his associates had been stopped by law

enforcement near Petaluma, California. 3278 advised that he was waiting to travel to San Rafael

in order to meet with SANCHEZ ESPINO. SANCHEZ ESPINO explained that he was going to

see what he could do to resolve the situation and that he may not be able to do anything.

SANCHEZ ESPINO stated that he would contact 3278 to advise him/her of the situation. This

conversation was conducted in the Spanish language and was recorded.

     29.    On this date, at approximately 1:37 PM, 3278 contacted SANCHEZ ESPINO via

cellular telephone, (707) 228-3049. SANCHEZ ESPINO advised that he would be unable to do

anything this date. SANCHEZ ESPINO also advised that the vehicle, containing firearms, used by his associates had been towed. 3278 stated that he/she was in San Rafael and requested to meet with SANCHEZ ESPINO. SANCHEZ ESPINO replied that he was where the vehicle had been originally towed from. SANCHEZ ESPINO stated that he would contact 3278 when he was traveling to his location. This conversation was conducted in the Spanish language and was recorded.

30.     On April 7, 2012 Oakland Police officer Teddy Chu advised S/A Bayless that Victor Hugo SANCHEZ ESPINO had attempted to contact 3278 by telephone on that date.

31.     On April 10, 2012, at approximately 3:18 PM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049. 3278 asked SANCHEZ ESPINO if they were traveling to his/her location in Oakland. 3278 stated there was a good "job" in Oakland. SANCHEZ ESPINO replied "oh yes". SANCHEZ ESPINO questioned if 3278 wished to speak with him. 3278 requested that SANCHEZ ESPINO meet with him/her to discuss the situation in person. 3278 suggested they meet in Oakland. SANCHEZ ESPINO replied they could meet at 10:00 AM the following day. 3278 and SANCHEZ ESPINO agreed to meet at a Walmart parking lot located in Oakland. This conversation was conducted in the Spanish language and was recorded.

32.     On April 11, 2012 at approximately 10:49 AM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049. 3278 advised SANCHEZ ESPINO that he/she was traveling to the meeting location. SANCHEZ ESPINO stated that he would meet with 3278 at the Best Buy, a location where they had previously met. This conversation was conducted in the Spanish language and was recorded.

33.     On April 11, 2012, at approximately 10:58 AM, 3278 traveled to a Walmart parking lot located at 8400 Edge Water Drive, Oakland, California. On this date, while waiting

–11–

for Victor Hugo SANCHEZ ESPINO and his associates to arrive, 3278 contacted SANCHEZ

ESPINO via cellular telephone. 3278 requested that SANCHEZ ESPINO meet him/her at the

Walmart location. 3278 stated that he/she did not wish to speak on the telephone. 3278

reiterated to SANCHEZ ESPINO that he/she desired to meet with SANCHEZ ESPINO at the

Walmart location. This conversation was conducted in the Spanish language and was recorded

one-sided.

34. On April 11, 2012, at approximately 11:45 AM, 3278 traveled to a Walmart

parking lot located at 8400 Edge Water Drive, Oakland, California. On this date, after waiting a

short period of time, SANCHEZ ESPINO and his associates arrived at the location in a Nissan

Sports Utility Vehicle and an Acura Sports Utility Vehicle. SANCHEZ ESPINO was observed to

be in the company of three additional Hispanic males. Subsequent to exchanging greetings, 3278

stated that there would be "seven kilos of coca" intended for Washington state and that he/she had

ordered an addition two kilograms. 3278 further stated that there would be an exchange involving

two vehicles. 3278 explained that one vehicle would contain the person who is going to take it

and the other vehicle would contain a person who resides in the Oakland area. 3278 reiterated

that he/she intended to order two kilograms, as a result, a total of nine kilograms would be

available. 3278 explained the manner in which the collection would occur.

35. 3278 stated there would be two persons present, one of which would be armed with

a firearm. 3278 advised that he/she was unsure if the second person was in possession of a

firearm. The subjects discussed how the robbery would be conducted. 3278 reiterated that the

exchange would be conducted with two vehicles. 3278 explained how, he/she would be

contacted between the hours of 2:00 PM and 2:30 PM and told the type of vehicles that would be

involved. 3278 further explained that he/she would also be told the date and time the exchange would transpire.

36.    3278 was questioned concerning the number of kilograms and the vehicles that would be used. 3278 advised that the transaction would occur at one of two gas stations located on High Street, Oakland, California. The subjects requested that 3278 identify the exact gas station in order to develop a plan. The subjects requested that 3278 take them to view the gas stations.

37.    3278 entered the Acura Sports Utility Vehicle in the company of subjects number two and four and traveled in the direction of the gas stations located on High Street. The Acura Sports Utility Vehicle was followed by the Nissan Sport Utility Vehicle containing SANCHEZ ESPINO and subject number three. 3278 advised subjects two and four that they had previously attempted to conduct a robbery. 3278 pointed out to subjects two and four the potential gas stations located in the area of High Street. 3278 reiterated the manner in which the transaction would occur.

38.    On this date, all vehicles returned to the Walmart parking lot. 3278 exited the Acura Sports Utility Vehicle and had a brief conversation with the subjects. 3278 then departed the area. This conversation was conducted in the Spanish language and was recorded.

39.    On April 11, 2012, at approximately 1:53 PM, 3278, contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049. 3278 advised SANCHEZ ESPINO that his/her associate wished to speak with them in order to ensure that he would not be harmed. 3278 requested to meet at 3:30 PM, on this date. SANCHEZ ESPINO agreed to meet at the Walmart parking lot but desired to meet the following day. 3278 stated that his/her associate wished to meet on this date. SANCHEZ ESPINO agreed to meet on this date. 3278 advised that his

–13–

associate would be armed on the day of the robbery however he would not resist. This conversation was conducted in the Spanish language and was recorded.

40.     On April 11, 2012 at approximately 4:14 PM, 3278 contacted SANCHEZ ESPINO via cellular telephone, (707) 228-3049. 3278 asked SANCHEZ ESPINO if he had arrived. SANCHEZ ESPINO replied that he had yet to arrive due to the traffic. SANCHEZ ESPINO stated that he would be arriving shortly. 3278 advised that he/she would be waiting with his/her associate. This conversation was conducted in the Spanish language and was recorded.

41.     On this date, at approximately 4:49 PM, S/A Bayless, 3278 and an additional ATF confidential informant, 350, traveled to a Walmart parking lot located at 8400 Edge Water Drive, Oakland, California. At approximately 4:51, 3278 received a call from SANCHEZ ESPINO stating that he was in the parking lot. At this time S/A Bayless observed a Silver SUV enter the parking lot and drive around behind S/A Bayless' undercover vehicle (UCV). S/A Bayless then left his parked location and pulled up next to SANCHEZ ESPINO's SUV. S/A Bayless rolled his window down and 350 had a brief conversation with SANCHEZ ESPINO. After doing so, 350 indicated that SANCHEZ did not feel comfortable parked there because of a marked Oakland Police vehicle that was parked just across from them.

42.     S/A Bayless moved his vehicle to the other side of the parking lot. SANCHEZ ESPINO followed in his SUV. On this date, once parked, S/A Bayless exited his vehicle along with 350 and 3278. S/A Bayless, SANCHEZ ESPINO, a male later identified as Jamex Eugenio CORONEL, and two other Hispanic males exited their SUV and walked over to meet S/A Bayless. The group exchanged pleasantries and greeted one another. After some joking around between 350 and SANCHEZ ESPINO's group, the conversation turned to the robbery.

−14−

43.     With 350 translating, S/A Bayless told the group that the robbery would only be for approximately nine kilos of cocaine and that he wasn't sure if that was something that would interest SANCHEZ ESPINO'S group.   At this point 350 told S/A Bayless that SANCHEZ and the group spoke little English, and wanted 350 to translate the conversation for them. (Later, S/A Zayas, who speaks fluent Spanish reviewed the audio and video of this meeting and advised that 350 translated what was said between S/A Bayless and SANCHEZ ESPINO's group). S/A Bayless told the group that he had three different suppliers that he dealt with when purchasing cocaine. One of which he didn't mind setting up to be robbed.   S/A Bayless went on to explain that when he picked up from this particular supplier, he would usually call and advise that he had money and was ready; the supplier would pick a parking lot to meet to do the exchange. S/A Bayless would then rent a van and drive to the parking location identified by the supplier. Once there, the cocaine supplier would get in the van with the cocaine and count S/A Bayless' money, and then leave. S/A Bayless told the group that they had to make it look like S/A Bayless had nothing to do with the robbery. After stating this, all four nodded in agreement.

44.     S/A Bayless asked if the group had ever done anything like this before. SANCHEZ ESPINO responded thru 350 that this is what they do for a living. That they had been doing this for awhile and that they knew what they were doing. No one in the group disagreed or acted surprised in any way.   S/A Bayless told the group that he was a little afraid because the suppliers were members of the La Familia cartel. To which SANCHEZ ESPINO responded, thru 350, that he didn't care. S/A Bayless said he wanted to let the group know that when the suppliers came to drop of the cocaine, one of them would have the drugs and the other one carried a firearm as protection. S/A Bayless also said that the armed guard was very violent and that he would not give up the cocaine without a fight. SANCHEZ ESPINO told 350 "that's what they do and that

−15−

they would take care of that". S/A Bayless told them that he wanted them to know that it was not going to be easy. SANCHEZ ESPINO stated that he understood.

45.     S/A Bayless asked 350 to ask SANCHEZ ESPINO how they wanted to do the robbery, and SANCHEZ ESPINO told 350 that they were going to split the cocaine fifty/fifty meaning half for S/A Bayless and half for them.    S/A Bayless then asked the group how they wanted to do the robbery. SANCHEZ ESPINO asked where S/A Bayless usually picked up his cocaine.    S/A Bayless explained that the supplier picked different parking lots in the area to meet. S/A Bayless further stated that it was usually in the area off I-880 at the Embarcadero, that there were a few hotels in the area and that the exchange would take place in one of those parking lots. SANCHEZ ESPINO stated that during the robbery they were going to take S/A Bayless' vehicle, and the supplier's vehicle, leaving them behind in the parking lot. 350 asked if SANCHEZ ESPINO was going to tie S/A Bayless up or anything SANCHEZ ESPINO replied that they were. SANCHEZ ESPINO further indicated which one of his crew members would be responsible for tying up S/A Bayless. 350 pointed to that crew member and stated "he's the one who is going to take care of you" (pointing to member #2).

46.     CORONEL stated that he wanted to follow S/A Bayless and 350 to the location where the robbery was going to occur so they could check out the area.    CORONEL stated that we could "work out the details when we get there".

47.     S/A Bayless, 350 and 3278 re-entered the UCV and began driving through the lot toward the exit.    S/A Bayless observed SANCHEZ ESPINO's vehicle following. As the two cars began to pull out of the parking area, SANCHEZ ESPINO'S vehicle was stopped by a traffic light. A few moments later, 3278 had a phone conversation with SANCHEZ ESPINO and advised him that S/A Bayless would wait for them on the northbound entrance ramp to the I-880. S/A Bayless

–16–

parked his UCV on the shoulder of the ramp and waited for SANCHEZ ESPINO to catch up. A few moments later SANCHEZ ESPINO showed up and followed S/A Bayless to the Motel 6 located just off the Embarcadero exit of the I-880.

48.     At approximately 5:20 PM, S/A Bayless reactivated the recording device as he exited the I-880 at Embarcadero. A few moments later, S/A Bayless pulled into the parking area of the ~~motel six~~, just before pulling in, SANCHEZ ESPINO called 3278.   SANCHEZ asked 3278 where the "park" was located so they could check it out. 3278 stated that he/she wasn't sure. At this point S/A Bayless exited the UCV with 350. S/A Bayless observed SANCHEZ ESPINO pull in, park and exit his vehicle. At this point SANCHEZ ESPINO and member number 2, an individual he had met earlier, also exited the vehicle and walk over toward S/A Bayless and 350 (CORONEL and member #4 remained in SANCHEZ ESPINO'S vehicle).

*[handwritten: Morel-6 KAC 4/19/12]*

49.     Once together in the parking lot, S/A Bayless explained to SANCHEZ ESPINO and member number 2 that this parking lot, and others in the general area, was the location where S/A Bayless picked up his cocaine. SANCHEZ ESPINO stated that he understood.   S/A Bayless again stated that this was a serious endeavor and that the armed guard might put up a fight which meant that SANCHEZ ESPINO and his crew might have to kill him. SANCHEZ ESPINO nodded in the affirmative. S/A Bayless again asked the two if this was something that they wanted to do. Both nodded in the affirmative.   S/A Bayless told SANCHEZ ESPINO and member number 2, that he trusted them not to kill him. Both stated that they wouldn't.   SANCHEZ ESPINO and his partner said that they needed one days notice before the robbery and that they wanted to meet again to go over the plan. S/A Bayless agreed.

50.     350 asked SANCHEZ ESPINO and his partner what exactly they were going to do with S/A Bayless. S/A Bayless said that if they had to kill the two guys, then it wouldn't matter, but

if they didn't, then it would look good if they tied him up. SANCHEZ and member number 2 agreed. Member number 2 told S/A Bayless that he was the one that would be taking care of S/A Bayless during the robbery and he further stated that when the robbery was taking place, he would be the one tying him up. At this point member number 2 asked if S/A Bayless would have a gun. S/A Bayless stated that he would. Member number 2 then stated that during the robbery he would put a gun on S/A Bayless and that he should just get down. S/A Bayless advised he would. On this date, the conversation ended with the agreement to speak again on Monday. This conversation was conducted in the Spanish language and was recorded.

51.     On April 16, 2012, at approximately 5:39 pm, 3278 placed a monitored and recorded phone call to SANCHEZ ESPINO at telephone phone number (707) 228-3049. 3278 stated to SANCHEZ ESPINO that 350 was unavailable to meet but his/her son, S/A Ernesto Diaz, would be at the next meeting. 3278 stated that he/she was with the white guy, S/A Bayless, and everything would be ready on Wednesday. 3278 stated that the white guy, S/A Bayless, wanted to meet the following day to tell SANCHEZ ESPINO what color the van would be and what time the job would be on Wednesday. 3278 stated that everything is ready for Wednesday and the white guy, S/A Bayless, wanted to meet tomorrow at 3:00 pm to discuss the job so everything would go well. SANCHEZ ESPINO agreed to meet the following day and stated that he would call 3278 tomorrow or 3278 could call him.

52.     3278 reminded SANCHEZ ESPINO about his/her two, referring to two kilos of cocaine that 3278 was going to receive from the drug robbery. SANCHEZ ESPINO told 3278 not to worry because they had already agreed upon it. This conversation was conducted in the Spanish language and was recorded.

-18-

53. On April 17, 2012, at approximately 1:50 PM, 3278 received two incoming phone calls from SANCHEZ ESPINO'S cell phone number, (707) 228-3049. 3278 did not answer the calls but within a few minutes placed a monitored and recorded phone call to SANCHEZ ESPINO at the same phone number. 3278 stated to SANCHEZ ESPINO that 3278 was getting off work and would be picked up by the guy, S/A Bayless, and his nephew, S/A Diaz, and they would be at Wal-Mart in a bit. At approximately 3:01 PM, S/A Bayless, S/A Diaz and 3278 traveled to the Wal-Mart parking lot located at 8400 Edgewater Drive, Oakland, California. 3278 placed a phone call to SANCHEZ ESPINO informing him that they were in the parking lot in a white van and provided a location in the parking lot where they were waiting.

54. S/A Bayless, S/A Diaz, and 3278 exited their vehicle and waited for SANCHEZ ESPINO. Within a few minutes SANCHEZ ESPINO and CORONEL approached S/A Bayless, S/A Diaz and 3278's location on foot. SANCHEZ ESPINO was wearing a dark ball cap, grey and white striped polo shirt and jeans; CORONEL was wearing a black vest, black t-shirt and jeans. Introductions and greetings were exchanged by all. S/A Diaz acted as translator between S/A Bayless and SANCHEZ ESPINO and CORONEL. S/A Bayless showed SANCHEZ ESPINO and CORONEL the van he uses and described how the one of the guys making the delivery gets in the van and counts the money then leaves the dope in the van. S/A Bayless stated that he ordered five, was going to get two fronted to him, and 3278 was getting two (referring to kilos of cocaine). S/A Bayless stated that the guy will bring nine or ten (referring to kilos of cocaine), and thinks that S/A Bayless will be bringing one hundred thousand cash. S/A Bayless told SANCHEZ ESPINO and CORONEL that in reality he had no money and did not plan on bringing any money to the fictitious drug supplier. CORONEL stated that they would get the guy as he was getting into the van. SANCHEZ ESPINO stated that if S/A Bayless could get the guys out of the van and in front

—19—

of the van doors, SANCHEZ ESPINO and CORONEL would come in from behind. S/A Diaz asked SANCHEZ ESPINO if they were going to have "fieros" with them, a commonly known Spanish slang term for firearms. SANCHEZ ESPINO stated that they will have everything with them.

55. S/A Bayless stated that there are two guys and one has a pistol with him. CORONEL stated that was fine, the pistol wasn't a problem. SANCHEZ ESPINO stated that pistol or no pistol, it didn't matter. CORONEL stated that when the guys get out of the van, S/A Bayless could take his time until SANCHEZ ESPINO and CORONEL arrived. SANCHEZ ESPINO stated that they were going to get the guys into the van. CORONEL stated that they were also going to have to get in the van to tie them up good. SANCHEZ ESPINO stated that they were going to tie up S/A Bayless as well so it did not look like S/A Bayless was involved. CORONEL stated that he was going to be the one tying up S/A Bayless. SANCHEZ ESPINO stated that the short guy (previously referenced as member number 2) was going to do it but CORONEL will be doing it because things changed. CORONEL stated that he will tell S/A Bayless to lie down in the van and that S/A Bayless should listen to what CORONEL tells him to do. CORONEL stated that if S/A Bayless has a pistol on him, he will be taking it from him and tying him up. CORONEL suggested S/A Bayless bring a suitcase with him so it looks like the money is in it and they will also take the suitcase so it looks believable. S/A Diaz stated that there was going to be a minimum of nine kilos of pure cocaine. S/A Bayless asked that they not shoot him; CORONEL stated that S/A Bayless needs to listen to him and cooperate. SANCHEZ ESPINO stated that S/A Bayless should struggle a little so it looks good.

56. S/A Diaz asked if it was just the two of them, and both SANCHEZ ESPINO and CORONEL replied that there was going to be three of them, two to secure the guys in the van and

one to secure S/A Bayless. CORONEL asked what time tomorrow and S/A Bayless replied two

o'clock. S/A Bayless stated that and he would call the guy when he had the money and the guy

would tell him where to meet. CORONEL stated that they should meet where there are not a lot

of police around. SANCHEZ ESPINO stated that they will be ready tomorrow at noon. S/A

Diaz stated that he would call SANCHEZ ESPINO tomorrow before the meeting. S/A Diaz

asked SANCHEZ ESPINO to call him after the job was done so they could meet up and give him

S/A Bayless' half. SANCHEZ ESPINO stated that they wanted to be close to S/A Bayless when

he makes the call. CORONEL stated that he was going to take S/A Bayless' cell phone, wallet

and van keys. S/A Diaz stated to S/A Bayless that CORONEL would not have a firearm with

him; to which SANCHEZ ESPINO corrected S/A Diaz by saying they would all have guns with

them. CORONEL explained what he meant to say was that the firearm he would carry would not

have a bullet in the chamber.

57.     All parties agreed to meet the following day at 1:30 PM in the same location

(Wall-Mart parking lot). CORONEL stated that they would be ready tomorrow at noon and

suggested they all eat lunch and talk more. The meeting concluded and S/A Diaz observed

SANCHEZ ESPINO motion with his hand for someone to come to his location. S/A Diaz

observed a silver colored pickup truck pull up being driven by an older unidentified Hispanic

Male. S/A Diaz observed SANCHEZ ESPINO and CORONEL get in the pickup truck and depart

the area. S/A Bayless, S/A Diaz and 3278 departed the area at approximately 3:33 PM. This

conversation was conducted in the Spanish language and was recorded.

**Arrest of Robbery Crew on April 18, 2012**

58.     On April 18, 2012 S/A Bayless met with other ATF agents and members of the
Oakland Police Department to formulate plans in regards to an undercover meeting and the
subsequent arrest of the above-referenced individuals. After plans were formulated S/A Bayless
equipped himself with an audio and video recorder which he placed on his person. This recording
device produced exhibit # E-26. S/A Bayless also placed an audio and video recording device in
his undercover vehicle (UCV).

59.     At approximately 1:10 pm S/A Bayless left the meet location en-route to the
Wal-Mart parking lot located at 8400 Edgewater Drive Oakland CA.   At approximately 1:26 pm
S/A Bayless activated the recording devices.   At approximately 1:30 pm S/A Bayless parked his
UCV on the north side of the parking lot.   At that time S/A Bayless called Oakland Police Officer
Teddy Chu and asked him to have CI 3278 place a call to SANCHEZ ESPINO and advise him that
S/A Bayless was in the parking lot.   Officer Chu advised that SANCHEZ was already in the
parking lot.

60.     At this point S/A Bayless exited the UCV and walked around and looked around
the parking lot. While doing so, S/A Bayless noticed a silver Nissan Maxima pull through the
parking area near the UCV. As the car approached S/A Bayless noticed that the car was driven by
a male Hispanic with a female passenger.   As the car pulled past S/A Bayless, both front seat
passengers were looking at S/A Bayless.   S/A Bayless also noticed that the passenger in the rear
of the vehicle ducked down in the back seat as the car passed S/A Bayless' UCV.   At
approximately 1:34 pm S/A Bayless again called Officer Chu and requested that he have the CI
place a call to SANCHEZ to make sure he knew S/A Bayless was in the lot.

61.     At approximately 1:37 PM, S/A Bayless exited his UCV and observed SANCHEZ
ESPINO walking through the parking lot toward S/A Bayless while talking on his phone. As
SANCHEZ approached S/A Bayless asked if he was "ready to go". To which SANCHEZ
ESPINO stated "yes". S/A Bayless asked "where is your car"? SANCHEZ ESPINO replied
by pointing to another area of the parking lot. S/A Bayless told SANCHEZ that "Flaco" (S/A
Diaz) was already sitting at a separate location and that SANCHEZ ESPINO could follow him
there and then S/A Bayless would place the call for the cocaine. At this point, to make sure that
there was no misunderstanding, S/A Bayless called S/A Dias so that he could translate for S/A
Bayless.

62.     S/A Bayless placed a call to S/A Dias and then gave the phone to SANCHEZ. S/A
Diaz and SANCHEZ had a brief conversation and SANCHEZ gave the phone back to S/A Bayless
giving him the thumbs up sign. SANCHEZ then began walking toward the northwest part of the
parking lot. S/A Bayless followed him in the UCV. S/A Bayless observed SANCHEZ ESPINO
walk up to the silver Maxima, that S/A Bayless had observed earlier. SANCHEZ stopped and
appeared to have a brief conversation with the driver of that vehicle. After doing so, SANCHEZ
walked over and met with FIERRO and CORONEL. S/A Bayless pulled in a parking space for a
brief moment and watched SANCHEZ, FIERRO and CORONEL enter a silver Dodge pickup
truck.

63.     At this point S/A Bayless backed up his UCV and began driving toward the exit of
the parking lot. As he was doing so, S/A Bayless observed the silver Dodge pick-up truck and the
silver Maxima followed. S/A Bayless drove to a parking lot located at 2400 Embarcadero
Oakland CA. S/A Bayless was followed close behind by the silver Dodge Ram pick-up truck and
the silver Maxima. At approximately 1:58 PM, S/A Bayless pulled in the lot and parked his UCV

–23–

next to S/A Diaz. S/A Bayless observed the pick-up truck and the silver Maxima park at the furthest point south in the parking lot. S/A Bayless exited the UCV and met with S/A Diaz and SANCHEZ ESPINO.

64. S/A Diaz traveled to Union Point Park located at 2311 Embarcadero in Oakland, California to meet with S/A Bayless, SANCHEZ ESPINO and other individuals regarding the robbery of multiple kilograms of cocaine. While S/A Diaz was waiting, he received a telephone call from S/A Bayless who requested he speak with SANCHEZ ESPINO. S/A Diaz spoke to SANCHEZ ESPINO and requested that SANCHEZ ESPINO follow S/A Bayless to where S/A Diaz was waiting so he would know where to deliver S/A Bayless' share of cocaine after the robbery. SANCHEZ ESPINO agreed to follow S/A Bayless to where S/A Diaz was waiting. The conversation between S/A Diaz and SANCHEZ ESPINO was in the Spanish language.

65. On this same date at approximately 2:00 pm, S/A Bayless arrived at S/A Diaz's location driving a white van. S/A Diaz observed a silver colored pickup truck and a silver colored sedan follow S/A Bayless into the parking lot. S/A Bayless parked near S/A Diaz while the two other vehicles parked in the south part of the parking lot.

66. SANCHEZ ESPINO and S/A Bayless walked over to where S/A Diaz was standing and SANCHEZ ESPINO and S/A Diaz greeted each other in Spanish. It should be noted that during the meeting S/A Diaz spoke in Spanish with SANCHEZ ESPINO and all other individuals present. S/A Diaz asked SANCHEZ ESPINO if he was ready; SANCHEZ ESPINO replied that he was ready. S/A Bayless showed SANCHEZ ESPINO a bag he had in the van that was purported to have money in it for the purchase of cocaine.

67. S/A Diaz asked SANCHEZ ESPINO about the other guys he showed up with; SANCHEZ ESPINO stated that they were over there. S/A Diaz asked SANCHEZ ESPINO to

call over the other guys so they would know what was going on and nothing would happen to S/A

Bayless. SANCHEZ ESPINO called out and CORONEL walked over to S/A Bayless and S/A

Diaz's location. SANCHEZ ESPINO stated that the girl wouldn't be there or get involved. S/A

Diaz asked if the girl would be driving. SANCHEZ ESPINO replied yes because it wouldn't look

suspicious.

68.     S/A Diaz asked SANCHEZ ESPINO if everyone knew what was going on;

SANCHEZ ESPINO replied yes, and stated that everyone knew very well. SANCHEZ ESPINO

stated that he already spoke to S/A Bayless and everything would be fine. SANCHEZ ESPINO

pointed to CORONEL and stated that he would be grabbing S/A Bayless. S/A Diaz recognized

CORONEL from the previous day's meeting in the Wal-Mart parking lot.

69.     SANCHEZ ESPINO stated that he would return and bring S/A Bayless' share.

S/A Diaz stated that he would not go anywhere and would be waiting for SANCHEZ ESPINO.

70.     S/A Diaz stated that he wanted to talk to the other guys and began walking towards

the other individuals. S/A Diaz, S/A Bayless, SANCHEZ ESPINO and CORONEL met with the

other individuals standing in the south corner of the parking lot. S/A Diaz and S/A Bayless

introduced themselves to everyone, all later identified as Milton Gamez FIERRO, Alejandro

PARRA-SOLORIA, Jaime Barrera OREGEL and Pamela LUNA. S/A Bayless stated that there

was going to be about nine, referring to nine kilos of cocaine, and two guys, referring to the guys

delivering the cocaine. S/A Diaz translated and stated in Spanish that there was going to be nine

kilos of pure cocaine and two guys, one with a pistol. S/A Diaz explained how the delivery takes

place, and asked S/A Bayless what the split was, referring to how the cocaine was going to be

divided. S/A Bayless stated fifty-fifty and asked if it was okay.

71.     S/A Diaz asked everyone not to hurt S/A Bayless. CORONEL pointed to

FIERRO and PARRA-SOLORIA, and stated that they would secure the guys. S/A Bayless stated to CORONEL not to shoot him. FIERRO stated that CORONEL was going to use a taser but wouldn't use it on S/A Bayless. CORONEL stated that he wouldn't use the taser on S/A Bayless but he would put it to his side.

72.    S/A Bayless, S/A Diaz and SANCHEZ ESPINO walked back to S/A Bayless' vehicle. During the walk S/A Diaz reiterated nine kilos and stated that he would be happy with one (kilo). SANCHEZ ESPINO stated God willing everything will go well. S/A Bayless and S/A Diaz walked away from the area, signaling the bust signal to agents staged in the area. All six suspects were immediately arrested without incident by ATF Special Response Team (SRT) members.

73.    Subsequent to the arrests of SANCHEZ ESPINO, FIERRO, CORONEL, LUNA, PARRA-SOLORIA, and OREGEL, the following items, were recovered:

   a.  Taurus, Model PT140, .40-caliber semi-automatic pistol, Serial Number SDR43254, loaded with seven (7), .40-caliber bullets. This firearm was located under the front passenger seat of the Nissan Maxima.

   b.  Argentina, Model 1911, .45-caliber semi-automatic pistol, Serial Number 69684. Next to this firearm was a high capacity magazine loaded with eight (8), .45-caliber bullets. These items were found in a green backpack located in the trunk of the Nissan Maxima.

   c.  Heckler and Koch, Model USP9, 9mm semi-automatic pistol, Serial Number 24-098539, loaded with ten (10), 9mm bullets. These items were found in a green backpack located in the trunk of the Nissan Maxima.

    d.  A bag of twenty-four (24) inch zip ties, located in the same green backpack containing the previously mentioned firearms.

    e.  Packaging tape and zip ties, located in the trunk next to the previously mentioned green backpack.

    f.  Nova XR5000, Stun Gun, Serial Number 0052385, located under the passenger seat of the Dodge Ram truck

74.    It should be noted, surveillance members observed the Nissan Maxima arrive at the arrest location, driven by PARRA-SOLORIA. The front passenger in this vehicle was LUNA. The rear passenger in this vehicle was OREGEL. Surveillance members observed the Dodge Ram truck arrive at the arrest location, driven by CORONEL. The front middle passenger in this vehicle was SANCHEZ ESPINO. The front passenger in this vehicle was FIERRO.

**POST-ARREST INTERVIEWS**

75.    On April 18, 2012, SA Villegas, along with OPD Detective Hector Jimenez interviewed Jaime "Juan" Barrera OREGEL after he was arrested and transported to OPD. OREGEL indicated the following:

76.    OREGEL found out about a "job" from Hugo Espino. (Victor Hugo SANCHEZ ESPINO). He found out the evening before that it would be a drug "job" and that they were going to sell the drugs for money. OREGEL knew Alejandro PARRA-SOLORIA, but did not know Pamela LUNA. OREGEL came to Oakland the night before and met with SANCHEZ ESPINO and CORONEL. They met at a place called "Tijuanas."

77.    At about that time, CORONEL brought out the black bag with the 3 firearms (described by OREGEL as a "9,", a ."45" and a ".380"). OREGEL didn't see them at that time, but was told that the bag contained firearms. OREGEL admitted after further questioning that he

knew about the "robbery' when they met at "Tijuanas." He indicated that PARRA-SOLORIA knew about it earlier the day of the arrest when they went to CORONEL's house around 10:30 AM.

78.     OREGEL stated that they were there until approximately 11:30 AM, when they were sent out to wait. OREGEL said that he, PARRA-LOLORIA and LUNA drove away in the Nissan maxima and got gas. They waited until about 12:00 PM. At that point SANCHEZ ESPINO, CORONEL and "Milton" (FIERRO) arrived in the Grey truck. They followed the Grey truck to 101, to the 580, to the 880. They arrived at Wal-Mart at approximately 12:15 PM. OREGEL stated that SANCHEZ ESPINO grabbed the bag of guns out of his truck and placed them into the Nissan Maxima at Wal-Mart. PARRA-SOLORIA opened the bag of guns and looked at them while they were sitting in the parking lot.

79.     SANCHEZ ESPINO said he was going to call the "White Guy from yesterday." Once the "White Guy" arrived, they followed him back onto the freeway and ended up at the place near the water. OREGEL indicated that the Skinny Mexican guy came over and started giving instructions to everyone about the robbery and what everyone's role was going to be. OREGEL said LUNA was supposed to be a driver, but she didn't bring her driver's license, so he thought that he may have ended up being the driver. OREGEL also indicated that SANCHEZ ESPINO stated that there would be a 50-50 split of the proceeds of the robbery.


## V.     CONCLUSION

For the foregoing reasons, I respectfully submit that there is probable cause to believe that Victor Hugo SANCHEZ ESPINO, Milton Gamez FIERRO, Jamex Eugenio CORONEL, Pamela LUNA, Alejandro PARRA-SOLORIA, and Jaime Barrera OREGEL have

violated Title 21, United States Code, Sections 846, 841(a), and 841(b)(1)(A): 846: conspiracy to distribute and to possess with the intent to distribute 5 kilograms or more of cocaine and Title 18, United States Code, Section 924(c)(1)(A): using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a drug trafficking crime.

KENNETH COOPER
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Sworn to and subscribed before
me this 19 this day of April, 2012.

HON. KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE